B.F. GOODRICH COMPANY, et al.

v.

Harold MURTHA, et al.

v.

RIDSON CORPORATION, et al.

Civil No. H–87–52 (PCD).

United States District Court,
D. Connecticut.

Jan. 8, 1991.

See also 697 F.Supp. 89.

Louis R. Pepe, David E. Rosengren, James W. Oliver, Bernard A. Pellegrino, Pepe & Hazard, Hartford, Conn., for B.F. Goodrich Co., et al.

Deming E. Sherman, Edwards & Angell, Providence, R.I., Susan H. Shumway, Shumway & Merle, Southport, Conn., for Uniroyal Chemical Co., Inc.

Richard B. Stewart, Asst. Atty. Gen., Environment and Natural Resources Div., H. Michael Semler, Sr. Atty., Environmental Enforcement Section, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Stanley A. Twardy, U.S. Atty. D. Connecticut, Ruth McQuade, Asst. U.S. Atty., U.S. Attorney's Office, Bridgeport, Conn., Daniel Winograd, Asst.

Regional Counsel, U.S. EPA–Region I, Boston, Mass., for the U.S.

William A. Butler, James W. Rubin, John M. Schultz, Dickstein, Shapiro & Morin, Washington, D.C., W. Wilson Keithline, Hartford, Conn., for Municipal Government Agency Collectors Group.

## RULING ON MOTION FOR SUMMARY JUDGMENT

DORSEY, District Judge.

The consolidated actions pertain to the cleanup of two landfills, Beacon Heights Landfill ("Beacon Heights") in Beacon Falls, Connecticut, and Laurel Park Landfill ("Laurel Park") in Naugatuck, Connecticut, identified by the Environmental Protection Agency ("EPA") and placed on the National Priority List, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA" or "Superfund"), 42 U.S.C. § 9601, *et seq.*, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"). The consolidated actions involve hundreds of parties which have been organized into groups.[1] Pending is the Municipal/Government Agency Collectors Group's ("municipalities" or "municipal defendants") motion for summary judgment.

PROCEDURAL HISTORY

In 1987, four actions[2] were filed by EPA, the State of Connecticut Department of Environmental Protection ("DEP"), Uniroyal Chemical Company, Inc. ("Uniroyal"), and B.F. Goodrich Company and other members of its coalition ("B.F. Goodrich" or "Beacon Heights Coalition") against the alleged owners and/or operators of the sites, Harold Murtha, Terrence Murtha, Murtha Trucking, Inc., Murtha Enterprises, Inc., Murtha Waste Control Corporation, Rubber Avenue Enterprises, Inc., Beacon Heights, Inc. and Laurel Park, Inc. (collectively "Murtha") for cleanup costs.

---

1. The groups consist of the Municipal Government Agency Collectors Group; non-municipal generator group; transporters and/or haulers.

2. The four consolidated actions are: *B.F. Goodrich Company, et al. v. Harold Murtha, et al.,* Civil No. N–87–52 (PCD); *Uniroyal Chemical*

*Company, Inc. v. Harold Murtha, et al.,* Civil No. N–87–67 (PCD); *State of Connecticut v. Harold Murtha, et al.,* Civil No. N–87–73 (PCD); and *United States of America v. Harold Murtha, et al.,* Civil No. N–87–74 (PCD).

Murtha commenced third party actions against approximately two hundred parties, including the municipal defendants,[3] seeking indemnification or contribution for cleanup costs, *B.F. Goodrich Co. v. Murtha v. Ridson Corp.*, Civil No. N–87–52 (PCD), Third Party Complaint at ¶¶ 8–19, and statutory and common law relief. *Id.* at ¶¶ 20–23.

A consent decree proposed by Murtha and EPA, DEP, Beacon Heights Coalition, and Uniroyal to settle all claims against Murtha for $5,375,000 has lodged. Consent Decree, *B.F. Goodrich Co. v. Murtha,* Civil No. N–87–52 (PCD) (All Cases) at 10 (lodged Feb. 13, 1990).[4] The decree is not yet court approved.

B.F. Goodrich and Uniroyal, the original plaintiffs against Murtha (hereinafter "plaintiffs"), have added claims against the municipal defendants.[5] Allegedly, each municipality by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for disposal or treatment of hazardous substances at Laurel Park or Beacon Heights. Uniroyal Complaint at ¶¶ 56–57; B.F. Goodrich Complaint at ¶¶ 67, 78. Pursuant to Sections 107(a)(1) to 107(a)(4) of CERCLA, 42 U.S.C. §§ 9607(a)(1)–(a)(4) (1982 & Supp. V 1987), all municipalities are claimed to be jointly, severally and strictly liable for the sites' cleanup costs. Uniroyal Complaint at ¶ 74; and B.F. Goodrich Complaint at ¶ 79. The complaints further allege municipal liability, pursuant to Section 113, 42 U.S.C. § 9613, and federal common law, for contribution. Uniroyal Complaint at ¶¶ 74–77; B.F. Goodrich Complaint at ¶ 80.

The municipalities now move for summary judgment on all counts on the basis that,

as a matter of law, the generation and collection of municipal solid waste ("MSW") does not subject them to liability under CERCLA.

DISCUSSION

A. *Summary Judgment Standard*

Summary judgment is appropriate only if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). The moving party bears the initial burden of demonstrating that no genuine issue of fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting). Once that burden is met, the non-moving party must set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of fact exists, the court must "resolve all ambiguities and draw all reasonable inferences against the moving party." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).

Where the non-moving party bears the ultimate burden of proof on an issue, the moving party need only demonstrate the absence of evidence to support an essential element of the nonmoving party's claim. *Brady v. Town of Colchester,* 863 F.2d 205, 210–211 (2d Cir.1988) (citations omitted). Then, "the burden shifts to the non-moving party to come forward with persuasive evidence that his claim is not 'implausible'." *Id.,* citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106

---

**3.** Originally included within the municipal group were: The Cities/Towns of Ansonia, Beacon Falls, Bethany, Hamden, Killingworth, Middlebury, Naugatuck, Orange, Plymouth, Seymour, Shelton, Southbury, Stamford, Waterbury, Watertown, Westport, Woodbury; the Naugatuck Treatment Company, the Housing Authority of New Haven, the Watertown Housing Authority, and the Connecticut Resources Recovery Authority. With the court's approval, the Naugatuck Treatment Company has left the group; and Milford, New Haven, Stratford, and Thomaston have been added.

**4.** Notice of the filing of the consent decree was given in the Federal Register on February 23, 1990 and the thirty day period for public comment terminated on March 26, 1990.

**5.** B.F. Goodrich, et al., were granted permission to file an amended complaint to add three hundred and eighty eight parties, eighty nine of which were already third party defendants.

S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment should not be granted where a reasonable inference may be drawn from the record in the non-moving party's favor. *Id.* (citations omitted).

### B. *Liability Under CERCLA*

CERCLA, enacted in 1980, granted the EPA broad authority to deal with hazardous substances, pollutants, and contaminants released into the environment. A Hazardous Substance Superfund was established, 26 U.S.C. § 9507, to enable the EPA to take response actions, pursuant to Section 104(a)(1), 42 U.S.C. § 9604(a)(1), to abate any such release. Superfund resources are used to address inactive hazardous sites by remedial actions (permanent remedy to prevent or minimize releases) or removal actions (short-term cleanup arrangements). The EPA may recover its response costs from responsible parties. Section 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A). Additionally, the EPA may, by suit or administrative order, compel potentially responsible parties ("PRPs") to take response action when a facility presents "an imminent and substantial endangerment to the public health or welfare." Section 106, 42 U.S.C. § 9606. Private parties who are held responsible may recover their response costs from other PRPs, § 113(f), 42 U.S.C. § 9613(f). *Regan v. Cherry Corp.*, 706 F.Supp. 145, 149 (D.R.I.1989); *see also* 40 C.F.R. § 300.71.

Four classes of persons may be liable for cleanup costs under Section 107(a). The first two classes include the present and some past owners and operators of facilities. 42 U.S.C. § 9607(a)(1) & (a)(2). The third class, allegedly including the municipalities, consists of persons who generated or arranged for disposal or treatment of hazardous substances. 42 U.S.C. § 9607(a)(3).[6] The fourth class includes transporters of hazardous substances. 42 U.S.C. § 9607(a)(4).

Responsible parties are strictly liable under CERCLA. *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 (2d Cir.1985), *modified*, 648 F.Supp. 255 (1986); *United States v. Monsanto*, 858 F.2d 160, 167 n. 11 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir.1988). When the environmental impact is indivisible, responsible parties are jointly and severally liable. *O'Neil v. Picillo*, 883 F.2d 176, 178–180 (1st Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v. R.W. Meyer*, 889 F.2d 1497, 1506–08 (6th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990). The reach of CERCLA is broad extending to the several links in the chain of waste disposition, origination through final placement, from which environmental pollution is generated. *State of New York v. General Electric*, 592 F.Supp. 291, 297 (N.D.N.Y. 1984). An exemption for municipalities would remove one link from the chain in derogation of Congress' broad imposition of responsibility. The following are the only defenses: release of hazardous substances caused by an act of God; an act of war; or certain acts or omissions of third parties other than those with whom the defendant has a contractual relationship. Section 107(b). *See also Shore Realty*, 759 F.2d at 1048; *United States v. Hooker Chem. & Plastics Corp.*, 680 F.Supp. 546, 557–558 (W.D.N.Y.1988).

### 1. *Elements of Liability under CERCLA*

A prima facie case of liability under Section 107 of CERCLA requires that: (1) the site be a facility; (2) there be a release or threatened release of a "hazardous substance" from the site; (3) the release or threatened release caused the plaintiff to incur response costs; (4) the defendants are covered persons within Section 107(a); and (5) the responsive actions taken and

---

6. Section 107(a)(3) imposes liability on:
   any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous sub-

stances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, . . . .

costs incurred were consistent with the National Contingency Plan. *Shore Realty,* 759 F.2d at 1043; *United States v. Northeastern Pharm. & Chem. Co.,* 579 F.Supp. 823, 843 (W.D.Mo.1984); *Hooker Chem. & Plastics Corp.,* 680 F.Supp. at 548–49. The municipalities argue they are not liable under Section 107(a)(3) because MSW is not hazardous and thus not covered by Section 107(a)(3).

### 2. *Designation of a Hazardous Substance Under CERCLA*

A "hazardous substance" includes substances designated as hazardous or toxic in specified environmental statutes or by EPA pursuant to CERCLA Section 102, 42 U.S.C. § 9602, and is defined as:

> (A) any substance designated pursuant to section 132(b)(a)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this Title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921, also known as the Resource Conservation and Recovery Act ("RCRA")] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. 6901, *et seq.*] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S. C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil ... and natural gas....

42 U.S.C. § 9601(14). As the municipalities acknowledge, CERCLA "provides no guidance on how to regulate MSW other than providing for the imposition of liability where MSW contains specific hazardous substances the release or threatened release of which causes response costs." Municipal Defendants' Memorandum at 14–15. If MSW contains hazardous substances or otherwise qualifies as hazardous waste under Section 101(14), the municipalities are liable pursuant to Section 107(a)(3). The municipalities, relying on RCRA and § 9601(14)(C) of CERCLA, contend MSW is not hazardous and thus not within CERCLA; notwithstanding their concession of liability for hazardous substances in MSW. *Id.*

### 3. *Application of RCRA*

RCRA was enacted in 1976 primarily to regulate the day-to-day management of solid wastes,[7] particularly hazardous waste at on-going treatment, storage and disposal facilities. *See United States v. Aceto Agricultural Chem.,* 872 F.2d 1373, 1376–77 (8th Cir.1989). EPA was authorized to promulgate standards for transporters of hazardous wastes and operators of hazardous waste facilities and to issue permits for hazardous waste facilities. 42 U.S.C. §§ 6921–25. EPA developed two distinct regulatory systems, one for "hazardous wastes" (Subpart C of RCRA) and one for non-hazardous solid wastes (Subpart D of RCRA). Only hazardous wastes are subject to the strict standards of the "cradle-to-grave regulatory regime [Subpart C]." H.R.Rep. No. 1016, Part I, 96th Cong., 2d Sess. 17, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6120. Such "hazardous wastes" are listed in 40 C.F.R. §§ 261.-30–33.

■ EPA's regulatory scheme, under RCRA, excludes "household waste"[8] from

---

**7.** It is not insignificant, consistent with RCRA and CERCLA's respective focus and purposes (immediate disposition regulation as opposed to correction of current pollution resulting from past disposition), that the former treats hazardous waste and the latter deals with hazardous substances. The two words and the concepts they embody suggest distinct congressional approaches.

**8.** Despite variations in levels from site to site, most studies indicate that the household hazardous waste in municipal streams does not exceed 1% by weight. Municipal Defendants' Memorandum at 24, n. 20, citing Office of Solid Waste, U.S. EPA, *Survey of Household Hazardous Wastes and Related Collection Programs,* at 1–2, 2–3 to 2–4, 4–6 to 4–7 (October 1986).

those solid wastes deemed hazardous and regulates it under the less stringent standards of Subpart D. 40 C.F.R. § 261.4.[9] In 1984, Congress clarified the "household waste exclusion," as follows:

(i) *Clarification of household waste exclusion*

A resource recovery facility recovering energy from mass burning of municipal solid waste shall not be deemed to be treating, storing, disposing of, or otherwise managing hazardous wastes for the purposes of regulation under this subchapter *if*—

(1) such facility—

(A) *receives and burns only*—

(i) *household waste* (from single and multiple dwellings, hotels, motels and other residential sources), and

(ii) solid waste from commercial or industrial sources that *does not contain hazardous waste* identified or listed under this section, and

(2) the owner or operator of such facility has established contractual requirements or other appropriate notification or inspection procedures to assure that hazardous wastes are not received at or burned in such facility.

RCRA Section 3001(i), 42 U.S.C. § 6921(i) (emphasis added). Relying on RCRA's household waste exemption, defendants contend that MSW is not a "hazardous substance" as defined by CERCLA. This argument lacks merit for several reasons.

Other courts, which have confronted the same argument with respect to RCRA's mining waste exclusion, have found the exclusion in 42 U.S.C. § 9601(14)(C) to have limited applicability. *Eagle–Picher Indus. v. EPA*, 759 F.2d 922, 927 (D.C.Cir.1985) ("The ordinary straightforward reading of that exception is that it applies to subparagraph (C)."); *State of Idaho v. Hanna Mine Co.*, 699 F.Supp. 827, 833 (D.Idaho 1987), *aff'd*, 882 F.2d 392 (9th Cir.1989); *United States v. Metate Asbestos Corp.*, 584 F.Supp. 1143, 1147 (1984). In *Eagle–Picher*, mining wastes and fly ash, suspended from regulation under RCRA, were still considered "hazardous substances" for purposes of CERCLA because they were covered under § 9601(14)(A) and the exception in a parenthetical clause in subsection (C) was held to apply only to that subsection. 759 F.2d at 927. If "Congress intended to exempt mining wastes and fly ash from the entirety of Section 101(14), it obviously could have placed the exemption at the beginning or the end of the section," as it carved out general exceptions for petroleum and general gas products. *Id.* at 927.

Likewise, Congress was aware of RCRA's household waste exclusion and could have excluded household waste from CERCLA liability. CERCLA's definition of "hazardous substance" is broad [10] and not determined by or dependent on the source of the waste. If the MSW, including household waste, contained a "hazardous substance" as defined in § 9601(14) and there is a release or threatened release of the substance at the sites, the municipali-

---

**9.** Section 261.4 provides in pertinent part:
(b) Solid wastes which are not hazardous wastes.
The following solid wastes are not hazardous wastes: (1) Household waste, including household waste that has been collected, transported, disposed, recovered, (e.g., refuse-derived fuel) or reused. "Household waste" means any waste material (including garbage, trash and sanitary wastes in septic tanks) derived from households (including single and multiple residences, hotels and motels).
When "household waste is mixed with other hazardous wastes, ... the mixture will be deemed hazardous" and subject to Subpart C. 45 Fed.Reg. 33,120 (May 19, 1980); *see Environmental Defense Fund v. Wheelabrator Tech.*, 725 F.Supp. 758 (S.D.N.Y.1989).

**10.** EPA has designated over 700 substances as "hazardous substances" pursuant to Section 102 of CERCLA. 40 C.F.R. 302.4(a). In addition to specific list of hazardous substances, EPA regulations also treat as a hazardous substance any "solid waste, ... which is not excluded from regulation as a hazardous waste under 40 C.F.R. 261.4(b), ... if it exhibits any of the characteristics identified in 40 C.F.R. 261.20 through 261.24." 40 C.F.R. § 302.4(b). The substances listed in Table 302.4, 40 C.F.R. § 302.4, fall under CERCLA's definition of a "hazardous substance" by Subsection 101(14)(B) and are entirely independent of the lists of hazardous wastes under RCRA.

ties are liable under CERCLA regardless of the origination of the substance.

Defendants also argue that applying CERCLA to household waste would work at cross-purposes with RCRA treatment of household waste as non-hazardous (Subpart D of RCRA). However, that result need not follow. If current disposition of household waste does not result in offsite pollution by releases of hazardous substances, then CERCLA would not apply. If disposal does result in such releases, then insulation from CERCLA's remedies would preclude rectification or cost recovery which would leave the superfund, i.e. the taxpayer, to bear the cost, an intention not supported by the statutes nor reasonably read into CERCLA. *See Smith Land & Imp. Corp. v. Celotex Corp.*, 851 F.2d 86, 91–92 (3rd Cir.1988) (Congress intended that the entities responsible for the hazardous release rather than the taxpayer through federal funds bear the cost of cleanup.), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989).

Furthermore, the household waste exclusion does not mandate exclusion of all MSW from CERCLA. "Household waste" and MSW are not synonymous. The composition of MSW may vary. EPA's Interim Municipal Settlement Policy defines MSW as:

Although the actual composition of such wastes *varies considerably at individual sites* MSW is generally composed of large volumes of non-hazardous substances (e.g., yard waste, food waste, glass, and aluminum) and may contain small quantities of household hazardous wastes (e.g. pesticides and solvents) as well as small quantity generator wastes [waste which does not exceed 100 kg./month of hazardous wastes or 1kg/month of acute hazardous wastes and is excluded from regulation as haz-

ardous under Subpart C]. Many industrial solid wastes and some commercial and institutional solid wastes are managed separately from household wastes but may enter the MSW waste stream.

54 Fed.Reg. 51,071, 51,074 (December 12, 1989). The EPA thus acknowledges that MSW may contain hazardous substances from household and non-household sources [11] and responsible parties, including municipalities, will be notified as PRPs. 54 Fed.Reg. at 51,075. MSW is not automatically excluded from CERCLA simply because "household waste" is so exempt under RCRA. *See Wheelabrator Tech.*, 725 F.Supp. at 774–75 (municipal waste streams may contain hazardous wastes from SQGs and from other generators); *see also, United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 165 (W.D.Mo.1985) (The fact that mining waste may not be a hazardous waste under RCRA does not mean that it cannot be a "hazardous substance" under CERCLA.).

The argument that MSW contains minimal toxic waste and thus should be exempt is disposed of by the fact that courts can apportion damages and thus prevent absurd results. *See United States v. Wade*, 577 F.Supp. 1326, 1340 (E.D.Pa.1983). "[L]iability under CERCLA attaches regardless of the concentration of the hazardous substances present in a defendant's waste, so long as the defendant's waste and/or contaminants in it are 'listed hazardous substances' pursuant to 40 C.F.R. § 302.4." *City of New York v. Exxon Corp.*, 744 F.Supp. 474 (S.D.N.Y.1990).

The legislative history [12] is devoid of any significant discussion on point. In a brief colloquy in the House of Representatives, during debate on an earlier Bill from which CERCLA evolved, H.R. 7020, Representa-

---

**11.** Non-household sources include, but are not limited to, small quantity generator wastes ("SQG") from commercial and industrial processes, used oil or spent solvents from private or municipal maintenances shops. 54 Fed.Reg. at 51,075.

**12.** The starting point in statutory construction is the language of the statute, *American Tobacco*

*Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982), but when the language is not determinative, courts must turn to the legislative history. *See Wilshire Westwood Ass'n v. Atlantic Richfield*, 881 F.2d 801, 805 (9th Cir.1989), citing *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

tive Stockman expressed concern that, although household products containing potentially dangerous materials [13] were excluded from RCRA, the new Bill would give the EPA broad power to pursue anyone, including municipalities, disposing of household waste, a result described as an "undirected regulatory blunderbuss." 126 Cong.Rec. H–9438–51 (1980); *see also* H.R. Rep. No. 96–1016, 96th Cong., 2d Sess., Pt. I at 72 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6147. However, Representative Stockman's corrective amendments to H.R. 7020 were rejected by the House. *Id.* Undoubtedly, Congress was principally concerned with disposal of large amounts of hazardous substances from industrial and commercial sources and "intended to have the chemical industry [the sector most responsible for damage] pay for the costs of [the environmental] cleanup." *State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1312–14 (N.D. Ohio 1983), citing S.Rep. No. 848, 96th Cong., 2d Sess. at 98 (1980). *See also,* 126 Cong.Rec. H.R. 9446 (comments by Representative Madigan (R.–Il.). Nonetheless, in CERCLA, Congress focused on rectifying the environmental pollution from inactive hazardous sites, regardless of the source of the waste.

█ Defendants also argue that imposing CERCLA liability on them is contrary to EPA treatment [14] of MSW as non-hazardous. EPA policy, however, does not support defendants' contention that MSW should be excluded from CERCLA liability. The EPA has issued an Interim Municipal Settlement Policy which acknowledges that MSW may contain hazardous substances and provides that responsible parties, including municipalities, may be notified as PRPs. 54 Fed.Reg. at 51,071–51,075 (December 12, 1989).

The policy is a guide to EPA employees in administering the Superfund and reflects EPA priorities. United States Memorandum at 22. It does not limit a private party's claims.

This interim policy does not provide an exemption from potential CERCLA liability for any party; potential liability continues to apply in all situations covered under section 107 of CERCLA. 54 Fed. Reg. at 51,073.

(B) *Municipal Wastes as Potential CERCLA Hazardous Substances*

Similarly, the statute does not provide an exemption from liability for municipal wastes. . . . To the extent municipal wastes contain a hazardous substance that is covered under Section 101(14) of CERCLA and there is a release or threatened release, such municipal wastes may fall within CERCLA liability framework. *Id.* at 51,074.

[Municipalities and private parties who are generators/transporters of MSW] may be notified as PRPs [15] if the MSW contains hazardous substances from non-household sources. Non-household sources include, but are not limited to, small quantity generator (SQG) wastes from commercial or industrial processes or activities, or used oil or spent solvents from private or municipally-owned maintenance shops. *Id.* at 51,075.

Nothing in this interim affects the rights of any party in seeking contribution from another party, unless such party has entered into a settlement with the United States or a State and obtained contribution protection pursuant to section 113(f) of CERCLA. . . . This interim policy is intended solely for the guidance of EPA personal. It is not intended and can not be relied upon to create any rights, substantive or procedural, enforceable by any party in litigation with the United States. The Agency reserves the right to act at variance with this policy and to change it at any time without public notice. *Id.* 51,076.

13. Such as bleach, batteries, rat killer, etc.

14. "After looking to the legislative history, courts also look to the interpretation ... by its administering agency as an aid in interpreting Congress' intent." *Wilshire,* 881 F.2d at 808.

15. EPA has notified two of the municipal defendants, the Town of Westport and the Borough of Naugatuck, that they are PRPs in connection with the Laurel Park site.

The policy, coupled with the legislative history and the lack of an explicit exemption of MSW from CERCLA, strongly suggests the absence of any intention to exclude MSW from CERCLA. CERCLA is a remedial statute, to be construed liberally to achieve its purposes and not to frustrate them. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986). To exempt municipalities could result in a potentially substantial proportion of the response costs, attributable to hazardous substances from MSW, being passed off to another PRP or absorbed by the Superfund. CERCLA provides for apportionment among the polluting sources and for preservation of the Superfund by recoupment of EPA's response costs. Both provisions reflect congressional policy which would be frustrated by a municipal exemption.

■ Nor does CERCLA distinguish between municipal and private parties for purposes of liability. Section 101(20)(D), 42 U.S.C. § 9601(20)(D), which exempts state or local governments from liability where they involuntarily acquired ownership of facilities, provides that:

> The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a State or local government shall be subject to the provisions of this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.

Municipalities, as such, are not exempt from CERCLA liability.

CERCLA was passed after RCRA and because the need to clean up hazardous waste sites was deemed impossible within the legal remedies then provided. *See* Hazardous and Toxic Waste Disposal: Joint Hearings on S1341 and S1480, H.R.Rep. No. 1016, Part I, 96th Cong., 2d Sess. 22, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6125. Thus, Congress provided for site cleanup with full knowledge of RCRA and its treatment of household waste. The absence of anything close to a clear grant of an exemption to municipalities strongly suggests that Congress did not intend RCRA to extend a cloak of immunity for municipalities under CERCLA. To the extent that any municipality disposed of or arranged for the disposal of a hazardous substance and there is a release or threatened release of the substance at a site, the municipality may be held liable under Section 107(a)(3).

### 4. *Liability of Municipal Defendants*

■ The municipalities argue that plaintiffs have failed to prove there is a question of fact. In opposing summary judgment, plaintiffs need only offer evidence that the claim is not unfounded. *Brady*, 863 F.2d at 210–11. Plaintiffs can meet this burden as to each municipality by producing evidence which raises a question of fact as to whether the municipality's MSW contained hazardous substances under § 9601(14). *Wheelabrator Tech.*, 725 F.Supp. at 774–75.

A number of municipal defendants have conceded disposal of MSW at one or both of the sites. The following is a summary of the evidence, as reported in municipalities' response to UDO #2 and Murtha's response to UDO #1 and #2, of disposal regarding each municipal defendant:

1. *City of Shelton*—1968–1969 contract with Murtha to collect refuse or MSW from transfer station to Beacon Heights and Laurel Park. *See* City of Shelton's Reply to Third Party Plaintiff's Interrogatories, August 3, 1989, pg. 2. Murtha alleges the city disposed of waste, containing hazardous substances, from 1969–1973 at an estimated volume of one 42cy compactor twice daily, six times a week. *See* Murtha's Response to UDO #1 at 4–5. Murtha admits it currently has no business records for the relevant time periods alleged. In addition, a bill for services rendered, indicates that Murtha collected "22 loads of tires" from Shelton's Public Works Department, destination is unknown. *See* City of Shelton's responses to UDO #2; Defendants' Appendix A at 3–4. The city claims, however, that tires are not specifically listed as haz-

ardous substances under § 101(14) of CERCLA and not treated as hazardous by the EPA, even though the materials may contain hazardous constituents. Memorandum by EPA, Office of General Counsel, *Characterization of Tires as Hazardous Substances*, (April 4, 1984). Relying on their expert's affidavit, plaintiffs contend that tires contain the following substances also found in the leachate of Laurel Park and Beacon Heights: naphthalene, pyrene, toluene, isophorone, and phenanthrene. Affidavit of Brown at ¶ 16. It is further alleged that this defendant's waste including the tires contributed to the concentration of hazardous substances found in the leachates at the sites. *Id.* at ¶ 21.

2. *Town of Woodbury*—Concedes contract with Murtha to collect "bulky waste" from November 1984 to April 1987. Town claims bulky waste was not hazardous based on DEP and town's definition or "bulky waste" as "[h]eavy or large objects such as furniture, mattresses, box springs, trunks, crates, tree stumps, tires and wastes from the maintenance, construction or demolition of residential, industrial or commercial structures, brush or cardboard in excess of established criteria." *See* Town of Woodbury's Response to UDO # 2 at 2–5. Plaintiffs' expert states that, according to defendant's definition of bulky waste which he has reviewed, such waste contains hazardous substances, such as acetone, benzene, butanone, 1,1–dichloroethane, methylene chloride, vinyl chloride, toluene, xylene, isophorone, vinyl acetate and phenol, which were also found in the leachates at the sites and contributed to the concentration of hazardous substances found therein. Affidavit of Brown at ¶¶ 17, 22. Town records indicate that, on August 10, 1984, the town issued an invitation to bid for hauling and disposal of designated solid waste, defined as "certain types of solid waste designated by the First Selectman or his designated representative, including non-metal bulky waste, brush and construction and demolition waste." *Id.* A similar invitation to bid was also issued in 1985, to which Murtha bid on October 4, 1985. Murtha alleges job orders, disposal slips, billing statements and account records, indicate that it picked up a 30 cy container twice a week from the town's dump which was used by residents and businesses. Murtha's Response to UDO # 1.

3. *City of Ansonia*—The city concedes that a 30cy container of approximately 5,210 tons of MSW disposed of at Laurel Park on or about June 10, 1986. *See* City of Ansonia's Response to UDO # 2 at 2. In addition, Murtha alleges, based on unidentified account records of 1986 and 1987, that the city disposed of MSW in 1987. *See* Murtha's Response to UDO # 1 at 13.

4. *Town of Beacon Falls*—The town concedes that, between 1970 and 1987, it contracted with Murtha for disposal of MSW and allegedly analogous refuse from commercial establishments at both sites. Town of Beacon Falls' Response to UDO # 2 at 10–12. In addition, during 1981–1985, Murtha hauled sludge from the town's wastewater treatment plant. *Id.* at 15–16.

5. *Town of Bethany*—The town concedes that it arranged for its residents to dispose of their household waste every saturday at Beacon Heights. *See* Town of Bethany's Response to UDO # 2 at 2. After Beacon Heights closed, the town arranged for its residents to dump waste in large metal compactor containers at Beacon Heights transfer station. *Id.* According to Murtha records, the relevant period ranges from 1971 to 1987. *See* Murtha's Response to UDO # 1.

6. *The Connecticut Resources Recovery Authority ("CRRA")*—Conceded it contracted with Connecticut Waste Processing Inc., for the transportation and disposal of waste from the New Haven Transfer Station (which in turn collected MSW from the City of New Haven and Hamden) to Beacon Heights. CRRA's Response to UDO # 2 at 1–2.

7. *Town of Hamden*—While in response to UDO # 2, the town claimed it had no records regarding disposal of waste by the town, in an amended response, the town acknowledged that it contracted with CRRA in 1977 and participated in New

Haven Interim Haulaway. Town of Hamden's Amended Response to UDO #2. Murtha alleges, based on billing invoices from 1978–1979, that the town's waste was disposed of, during a six month period, by a private hauler from CRRA at the landfill. Murtha's Response to UDO #1 at 5.

8. *City of New Haven*—The only evidence of involvement, to which the city concedes in part, has been discussed under CRRA's activities with respect to the site. Defendants' Reply Memorandum, Exhibit A at 9; *see also* CRRA's Response to UDO #2 at 1–2.

9. *Housing Authority for the City of New Haven ("HANH")*—Acknowledges the existence of documents regarding contract specifications, bid resolution, contracts and internal memos referencing contract for rubbish removal between HANH and Murtha trucking from September 1979–November 1981. HANH's Response to UDO #2 at 4–5. HANH cannot dispute Murtha's claim that 1,410 cy of waste disposed at Laurel Park. *Id.* Murtha alleges the waste disposed consisted of MSW from housing projects, including waste from renovation of apartments. Murtha's Response to UDO #1 at 5.

10. *Town of Killingworth*—Town concedes that, pursuant to a contract with Murtha, MSW was collected and disposed of by Murtha between April 1974 and May 1977. Town of Killingworth's Response to UDO #2 at 4–6.

11. *Town of Middlebury*—Between 1968 and 1983, the town contracted with Murtha for disposal of its MSW, including waste from commercial establishments, which was taken from a transfer station to Beacon Heights and Laurel Park. Town of Middlebury's Response to UDO #2 at 4–6; Supplemental Responses at 2.

12. *Borough of Naugatuck*—Between 1950 and 1987, the borough disposed of MSW and bulky waste, that it collected from residences, town offices, housing units, schools, and small commercial establishments, including gas stations. Borough's Response to UDO #2 at 3–10; Defendants' Exhibit A at 13; Murtha's response to UDO #1 at 12–14. The MSW was predominantly disposed of at Laurel park. Plaintiffs' Memorandum at 31.

13. *Town of Orange*—From 1970 to 1987, the town contracted with Murtha to haul residential waste from the transfer station to a Murtha site. Town of Orange's Response to UDO #2 at 1–4. The town concedes it also allowed some nontoxic nonliquid commercial, industrial, and construction waste to be brought to the transfer station. *Id.; see also* Defendants' Exhibit A at 14.

14. *Town of Plymouth*—From 1974 to 1983, the town contracted with Murtha to haul and dispose of its MSW, from residential and commercial sources. Town of Plymouth's Response to UDO #2 at 1–3. During the relevant time period, the town also accepted metals, waste oil, newspaper, and glass, but it claims those materials were kept separately and recycled. *Id.* at 4.

15. *Town of Seymour*—From 1975 to 1987, the town contracted with Murtha to collect its MSW from a transfer station, with Laurel Park as the designated disposal site and the Incinerator Plant in Ansonia the back up site. Town of Seymour's Response to UDO #2 at 2. Since 1979, Murtha also collected bulky waste. *Id.* at 4. The town claims that, because the contract with the hauler did not allow for pick up of other types of waste, only household refuse was collected. *Id.* Murtha alleges the sources of waste is also believed to have come from commercial and industrial sources. Murtha's Response to UDO #1 at 4.

16. *City of Stamford*—The city claims it has no records of its own indicating that any of its wastes had been disposed at any of the sites. City of Stamford's Response to UDO #2 at 2. However, the city acknowledges the existence of receipts which indicate that over a two week period city wastes were taken to "Murtha" and/or dumps with a code prefix "M" believed to refer to Murtha and a DEP inspection report indicating that Stamford incinerator ash and sewage sludge was allegedly used as a cover for Laurel Park in July of 1985. *Id.* at 3–4; Defendants' Exhibit A at 16.

The city claims that any waste taken by Murtha came from the city's own treatment facility and while private/commercial haulers were allowed to use the facilities, such wastes were carefully monitored to exclude hazardous wastes. Defendants' Exhibit A at 16.

17. *Town of Stratford*—Although not admitted, the town acknowledges the allegations of Murtha and plaintiffs that it disposed of MSW and tires at Beacon Heights from 1973 to 1979. Appendix A to Defendants' Reply Memorandum at 21; Plaintiffs' Memorandum at 33, Coalition's Response to UDO #2, Exhibit 2.

18. *Town of Thomaston*—During Murtha's joint operation of the municipal transfer station with Robert Johnson d/b/a/ Suburban Sanitation from August 17, 1983 to March 28, 1987, town's MSW was disposed of at one of the Murtha sites, allegedly Laurel Park. Defendants' Exhibit A at 17; Affidavit of Eugene McMahon, First Selectman, Town of Thomaston, May 24, 1990 at 2. Plaintiffs' Memorandum at 33. The town claims its only involvement was to provide a location for the transfer station, pay Murtha a monthly fee for hauling and disposing of the waste and to operate a town-wide household bulky waste pick-up during the months of May to October. Affidavit of McMahon at 2.

19. *Town of Watertown*—From March 1, 1983 to April 30, 1987, the town contracted with Murtha to operate a transfer station in town and to dispose of all waste collected therein. Town of Watertown's Response to UDO #2 at 1. The town further acknowledges that the contract provided for the acceptance of non-hazardous commercial-industrial waste, bulky waste, and demolition and construction waste at the transfer station but it claims to have no knowledge of anything but normal household waste being collected at the station. *Id.* at 3. Murtha claims the waste was generally taken to Laurel Park and in some cases brought directly by private haulers. Murtha's Response to UDO #1 at 5; Murtha's Response to UDO #2 at 216.

20. *The Watertown Housing Authority ("WHA")*—Residents' refuse from two elderly unit complexes, owned and operated by WHA, was collected and deposited at the Watertown transfer station during the period of March 1, 1983 to April 30, 1987. WHA's Response to UDO #2 at 1-2.

21. *Town of Westport*—Between 1971-1977, the town contracted with Murtha for collection of waste from its transfer station to a destination unknown from its records. Town of Westport's Response to UDO #2 at 2. Murtha alleges its records indicate it either went to Beacon Heights or Laurel Park. Murtha's Response to UDO #1 at 2; Murtha's response to UDO #2 at 217.

22. *City of Waterbury*—The city acknowledges the existence of a "customer pick-up receipt" from Murtha, listing the Waterbury Police Department–New Bldg." as customer. City of Waterbury's Response to UDO #2 at 2. Murtha alleges that, in connection with this project, the city disposed of spent solvents, paint waste, waste pesticides, scrap metals, insulation and other wastes. Murtha's Response to UDO #1 at 4-5. The city claims that Ray Adler, Inc., who was hired by the city to construct the building, was responsible for all waste removal, pursuant to the contract. City of Waterbury's Response to UDO #2 at 2. In addition, Murtha alleges that the city disposed of lime stabilized sludge from the Waterbury Treatment Facility for a period of at least a month during 1978. Murtha's Response to UDO #1 at 4.

23. *Town of Southbury*—Neither party, in its submission, addresses the allegations of involvement or evidence linking the town of Southbury to either of the sites. However, a review of the town and Murtha's Response to the UDOs, reveals a single document linking the town to either of the sites. The document consists of a statement from Murtha Trucking indicating disposal of 22 loads of scrap tires. Town of Southbury's Response to UDO #2 at 2; Murtha's Response to UDO #1 at 4. There is no evidence that the loads contained anything other than tires or that there was other disposal of waste by the

town. In view of the discussion of disposal of tires regarding the City of Shelton, a question of fact exists and summary judgment is not warranted.

The evidence submitted by the parties indicates a question of fact exists as to whether the waste disposed of by the municipalities contained hazardous substances under § 9601(14). The allegations of disposal of MSW by the municipalities varies. If found liable, the amount of contribution by each municipality would be proportionate to the degree of responsibility.

Defendants' contention, based on their responses to the UDOs, that their waste did not contain hazardous substances does not vitiate plaintiffs' proffer. Further, the record does not establish the absence of any hazardous substances from all of the MSW disposed of at either of the two sites. According to expert reports and generic studies, .3 to .4 percent of MSW constitutes hazardous substances. *See* Defendants' Memorandum at 25 n. 20; *see also* Affidavit of Kirk W. Brown, Ph.D. at ¶¶ 4–6. Brown's review of all the UDO responses, studies of MSW, and studies relating to the leachates from the landfills, results in the conclusion that "the MSW of the defendant municipalities and governmental agencies contained hazardous substances which have been found in the leachate of both Laurel Park and Beacon Heights and contributed to the concentration of hazardous substances found therein." Affidavit of Brown at ¶ 15. He has identified eleven hazardous substances [16] found in MSW landfill leachates which were also found at the leachates from Laurel Park and Beacon Heights. *Id.* at ¶ 11. Defendants concede

that the generic studies, while not dispositive are probative "and see no reason yet developed in the case why MSW from the Connecticut municipalities should radically differ from the MSW covered in the studies." Defendants' Memorandum at 25 n. 20. Plaintiffs have offered sufficient evidence to suggest a question of fact exists as to whether MSW and/or the waste disposed of contained hazardous substances found in the leachates of either or both Laurel Park and Beacon Heights.

The claim that MSW is not hazardous under CERCLA because its disposal is regulated by RCRA and the Connecticut Solid Waste Management Law, Conn.Gen. Stat.Ann. § 22a–207, *et seq.*, lacks merit. Under the Connecticut Solid Waste Management Law, each

> municipal authority shall make safe provisions for the safe and sanitary disposal of all solid wastes which are generated within its boundaries....

Conn.Gen.Stat.Ann. § 22a–220(a). The DEP oversees and regulates all MSW disposal. Conn.Gen.Stat.Ann. § 22a–208(a). The municipalities contend that, because of that regulation, they could not have disposed of hazardous substances or contributed to the environmental damage.[17] Regulation by RCRA and Connecticut law does not exempt defendants from CERCLA liability.

Regulation does not guarantee compliance. "[H]azardous waste regulations under RCRA went into effect relatively recently and ... facilities historically regulated under Subtitle D may have accepted

16. Those substances are: acetone; benzene; 2–butanone; 1,1–dichloroethane; ethylbenzene; methylene chloride; phenol; toluene; 1,1,1–trichloroethane; vinyl chloride; and xylene.

17. Alternatively, the municipalities argue that the State is liable for the MSW by virtue of its regulation and control of MSW. The State of Connecticut is not a defendant or plaintiff to the actions brought by plaintiffs. Even assuming the State of Connecticut were a proper party and bound by a judgment, defendants' claim must fail. The cases relied on by defendants, *CPC Int'l, Inc. v. Aeojet–General Corp.*, 19 Chem. Waste Lit.Rep. 395 (W.D.Mich.1989), and *United States v. Stringfellow*, 19 Chem.Waste Lit.Rep.

1034 (C.D.Cal.1990) (state managed the site in question and admitted responsibility for the site), simply stand for the proposition that a state can incur liability under CERCLA for its own actions, not for those of others it regulates. *See United States v. Castle County*, 19 Chem. Waste Lit.Rep. 1008, 1017 (D.Del.1990) (state not liable under Section 107 because its "day-to-day operational mandates amounted to nothing more than the implementation by the state of its regulatory requirements"). Furthermore, compliance with all regulations is not an affirmative defense to liability under CERCLA because the latter imposes strict liability. *United States v. Dickerson*, 640 F.Supp. 448, 451 (D.Md.1986).

large quantities of hazardous wastes before such disposal became illegal." Steinzor, *Local Governments & Superfund: Who Will Pay the Tab?*, THE URBAN LAWYER, Winter 1990, Vol. 22, No. 1, 79, 138 n. 185. Waste disposal, here, dates back to 1950, long prior to RCRA. The municipalities' reliance on RCRA for their exclusion from CERCLA fails to account for their liability when RCRA did not exist or was not complied with.

This is particularly significant where there is evidence, as defendants concede, of violations of the regulations and issuance of illegal permits. Defendants' Memorandum at 64–67. The municipalities note that a DEP inspection in 1976 revealed several permit violations at Beacon Heights, but no action was taken. *Id.* at 66 n. 59. In addition:

> [t]he state has listed the numerous permits it granted to both industrial and municipal entities for the disposal of wastes at the two sites in State Response to U.D.O. 2 at 6–8. These wastes included chemicals and hazardous substances from the industrial entities.

*Id.* at 64 n. 56.

CERCLA was enacted to address the deficiencies in RCRA which left serious regulatory gaps. *See* H.R.Rep. No. 1016, Part I, 96th Cong., 2d Sess. 22, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6120, 6125; *see also United States v. Shell Oil Co.*, 605 F.Supp. 1064, 1071–72 (D.Col. 1985) (RCRA is ineffective in abating the ongoing deterioration resulting from wastes which had been dumped in the past); *United States v. A & F Materials Co.*, 578 F.Supp. 1249, 1252 (S.D.Ill.1984) ("RCRA does not apply to the thousands of dormant sites that are not currently posing an imminent hazard" and is useless if a financially responsible owner of the site cannot be located.); *Northeastern*, 579 F.Supp. at 835 (existing law is inadequate to deal with the problem of inactive hazardous waste sites). RCRA's limited scope,

coupled with "EPA's failure to promulgate regulations in a timely fashion, is delaying state [regulatory] programs" and adding to the problem of inactive hazardous sites. *See* H.R.Rep. No. 1016, Part I, 96th Cong., 2d Sess. 22, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6125.

Nonetheless, compliance with regulations is not a valid defense. To exclude municipalities from liability for proven disposition of hazardous substances, if such be the case, would leave the superfund to bear the cost for their contribution to the problem, a result not intended by Congress. *See Smith Land & Imp. Corp.,* 851 F.2d at 91–92. CERCLA liability applies regardless of the amount of hazardous substances contributed. *Wade,* 577 F.Supp. at 1340; *Exxon Corp.,* 744 F.Supp. 474 (S.D.N.Y. 1990). If plaintiffs can show that, despite the regulations, hazardous substances were deposited of which there was a release or threatened release at the site, liability properly exists. *See Wheelabrator,* 725 F.Supp. at 775.

This conclusion does not shift the cleanup cost from the industrial polluter to the taxpayer.[18] The degree of liability to which the municipalities are exposed will be determined by the extent of their contribution to the problem. The municipalities' liability under CERCLA will, accordingly, be limited to a share based on the amount of disposition shown to have contributed to the damage. *See* Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1).[19]

### C. *Liability under CERCLA as Transporters and/or Arrangers*

The municipalities contend that some of them were merely transporters and as such exempt under Section 107(a) of CERCLA. They rely on Section 101(20)(C) which exempts common or contract carriers that deliver hazardous substances to a disposal facility. The municipalities assume, without argument, that municipalities are

---

18. This was a concern expressed by the municipalities, amicus briefs and commentators. *See* Steinzor, *supra,* No. 1 at 82.

19. Section 113(f)(1) provides in pertinent part:

> In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate....

"common or contract carriers" within Section 101(20)(C).

As "arrangers" of the transport and disposal of hazardous substances municipal defendants may be liable under Section 107(a)(3) of CERCLA, which imposes liability on:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity.

Even if the municipalities did not transport MSW to the disposal site, they are, nevertheless, responsible if they "arranged for disposal or treatment" or "arranged with a transporter for transport for disposal or treatment" within the meaning of Section 107(a)(3). *See Dayton Independent School Dist. v. United States Mineral Prod. Co.*, 906 F.2d 1059 (5th Cir.1990), (CERCLA holds liable those defendants who arrange for disposal of solid waste). Their argument that the waste was generated by residents, not the municipalities themselves, is unavailing. A person need not have generated the hazardous substances to incur liability under Section 107(a)(3). *United States v. Consolidated Rail Corp.*, 729 F.Supp. 1461, 1469 (D.Del. 1990), citing *United States v. Bliss*, 667 F.Supp. 1298, 1306 (E.D.Mo.1987); *see also Northeastern*, 579 F.Supp. at 847 (person arranging for disposal is liable under Section 107(a)(3) and need not own the hazardous substance or facility). Thus, municipal defendants may be held liable under Section 107(a)(3) as "arrangers" of disposal or treatment of waste.[20]

## CONCLUSION

Accordingly, municipal defendants' motion for summary judgment is denied.

SO ORDERED.

---

**20.** Having reached this conclusion, this court need not address the issues concerning transporter liability raised by the Transporter Group's amicus brief.