**UNITED STATES of America, Plaintiff,**

v.

**ALLIEDSIGNAL, INC. and Amphenol Corp., Defendants.**

**Alliedsignal, Inc. and Amphenol Corp., Third–Party Plaintiffs,**

v.

**Town of Sidney, New York, Village of Sidney, New York, Town of Masonville, New York, and Town of Tompkins, New York, Third–Party Defendants.**

**No. 97–CV–0436.**

United States District Court, N.D. New York.

Aug. 18, 1999.

Office of the United States Attorney, Albany, NY (James C. Woods, AUSA, of counsel), United State Dep't of Justice, Environmental Enforcement Section, Washington D.C. (George A.B. Peirce, AUSA, Jonathan A. Marks, AUSA, of counsel), for U.S.

Shanley, Sweeney Law Firm, Albany, NY (J. Michael Naughton, of counsel), Whiteman, Osterman Law Firm, Albany, NY (Philip H. Gitlen, of counsel), for Defendants/Third–Party Plaintiffs.

Young, Ritzenberg Law Firm, Executive Woods, Albany, NY (Kevin M. Young,

Kristin Carter Rowe, of counsel), for Third–party Defendants.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

The United States of America commenced the instant litigation against defendants Alliedsignal, Inc. and Amphenol, Corp., as successors in interest of the Bendix Corp. (collectively "Alliedsignal" or "defendants"), pursuant to section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9607 ("CERCLA"), seeking recovery of costs incurred by the United States with respect to the release or threatened release of hazardous substances at or from the Sidney Landfill Superfund Site (the "SLF" or the "Site") located in the Towns of Masonville and Sidney, New York. Defendants, in turn, commenced a third-party action against the Town of Sidney, the Village of Sidney, the Town of Masonville, and the Town of Tompkins (collectively the "municipal defendants") seeking: (1) recovery for past and future response costs at the Site pursuant to 42 U.S.C. § 9607; (2) contribution for all past and future response costs pursuant to 42 U.S.C. § 9613, N.Y.C.P.L.R. § 1401, and common law; (3) indemnification; and (4) a declaratory judgment defining the future obligations of the parties. Presently before the Court is the United States' motion for entry of a consent decree between the United States and the municipal defendants, and the municipal defendants' motion pursuant to FED. R. CIV. P. 56 seeking dismissal of the Third–Party Complaint.

## I. BACKGROUND

In the early 1960s, Devere S. Rosa ("Rosa") purchased a garbage route in the Town of Sidney, New York. The purchase included a parcel of land now known as the Richardson Hill Road Landfill (the "RHRL"). Rosa contracted with individual residents in the area to collect their refuse and deposit it at the RHRL.

On July 9, 1964, the Town of Sidney entered into a five-year contract with Rosa for the use of the RHRL. In particular, the parties contracted "for disposal ... of all garbage and refuse from that portion of the Town of Sidney located outside the corporate limits of the Village of Sidney, as well as used residue oil as disposed of by the Scintilla Division of the Bendix Aviation Corporation, located at Sidney, New York." Pursuant to the agreement, Rosa agreed to "provide such sanitary land fill operation, ... take care of and handle all of such material deposited," maintain the landfill in proper condition, ensure reasonable access to the landfill, conduct the landfill "in a manner satisfactory and acceptable to the New York State Department of Health," keep the landfill open and available for use "Monday through Saturday from 7 a.m. to 4 p.m.," and to "collect and pick up garbage at the East Sidney Dam Recreation Area at least once per week." Aside from garbage at the East Sidney Dam Recreation Area, Rosa was not responsible for collecting garbage. In exchange, the Town of Sidney agreed to pay Rosa an annual fee. Residents were still obligated to contract with a hauler to have their garbage picked up and disposed of at the RHRL.

On October 31, 1964, the Town of Sidney and Village of Sidney (the "Sidney Defendants") entered into a five-year agreement with Rosa's father, Devere D. Rosa ("Devere"),[1] for the use of the RHRL. This agreement was substantially similar to the July 1964 agreement, except that it now permitted residents of the Village of Sidney to also use the landfill in exchange for an annual fee.

In or about 1964, Devere also contracted

---

1. Rosa apparently operated the RHRL together with his father until approximately 1966. At that time, Devere D. Rosa took over the ownership and operation of the RHRL.

with the Bendix Corporation ("Bendix")[2] to collect and dispose of their waste oil and other waste from their Scintilla Division in the Town of Sidney, New York.[3]

In 1966, a brook located near the RHRL caught fire. Investigation by the New York State Department of Health ("DOH") revealed that oil had discharged from the RHRL to the brook and caught fire. As a result, the DOH directed Devere to cease disposing oil from Bendix at the RHRL.

On November 17, 1967, Devere purchased the SLF, which is located on the opposite side of the road from the RHRL, at a tax sale. On December 1, 1967, Devere began dumping waste at the SLF. On or about December 19, 1967, the DOH inspected the Site and found that it suffered from numerous environmental deficiencies. Accordingly, the DOH ordered Devere to discontinue dumping immediately at the Site. DOH inspections in January and February 1968 indicated that Devere complied with the DOH's order and that the Site was not being used for dumping. At some point in time, however, Devere resumed dumping at the Site. An April 1968 memorandum from the DOH regarding a recent inspection indicated that no oil had been dumped at the Site. A May 1968, DOH inspection, however, revealed that oil had recently been disposed of at the Site. Because of the hazards the Site posed to the local water supplies and because Devere had not applied for a permit to operate the Site, the DOH ordered him to cease further use of the Site and compact and cover all refuse. Notwithstanding the DOH's order, Devere continued to dump

refuse at the Site. A June 1968 DOH investigation again revealed the presence of waste oil at the Site. That investigation also revealed that the RHRL was still being used for dumping. A June 17, 1968 memorandum by the DOH noted that "considerably more oil has been dumped... at th[e] [SLF]."

The United States and the municipal defendants contend that Bendix disposed of its waste oil and solvents at the SLF between approximately 1967 and 1969. Bendix, on the other hand, insists that beginning in approximately 1966, when it was directed to cease sending waste oils and solvents to the RHRL, it returned to its prior practice of disposing of such wastes at the Hill Site. According to Bendix, this continued until mid–1969 when Bendix acquired a Prenco incinerator, which obviated the need to send out the waste oils and solvents.

In 1970, Devere entered into an agreement with the Sidney Defendants, which was substantially similar to the prior 1964 agreements. The primary differences in the 1970 agreement were that it no longer referenced the dumping of oil from Bendix, it omitted the prohibition on individual or private dumping, and Rosa was no longer required to collect refuse from the East Sidney Dam Recreation Area. The parties dispute whether the 1970 contract referenced dumping at the RHRL or the SLF.[4]

On or about April 1, 1971, James W. Bartlett ("Bartlett") took possession of the Site from Devere. Bartlett continued to

---

2. Defendants Alliedsignal, Inc. and Amphenol Corp. are the corporate successors in interest to Bendix, which formerly operated a manufacturing facility known as the Scintilla Division in the Town of Sidney, New York.

3. Throughout the 1960s, Bendix generated municipal solid waste, spent waste oils, solvents, and industrial wastes including lubricating oils, cutting oils, chlorinated solvents and flammable solvents. Prior to 1964, Bendix disposed of its waste oil and solvents in a pit on its property known as the "Hill Site." Beginning in approximately 1964, Bendix

used Devere's services and sent its industrial waste to the RHRL.

4. The Sidney defendants note that the language in the 1970 contract identifying the location of the landfill is identical to that of the 1964 contracts that clearly referenced the RHLF. This, of course, suggests that the 1970 contract was for disposal at the RHLF. Alliedsignal points out, however, that the RHLF was closed by 1970 and, therefore, the latter agreement must have referred to the SLF.

dispose of waste at the Site until he closed it on or about October 31, 1972.

In or about 1987, the New York State Department of Environmental Conservation investigated the Site and found the presence of hazardous substances, including metals, volatile organic compounds ("VOCs"), and polychlorinated biphenyls ("PCBs"). In 1989, the Site was included on the National Priorities List of Superfund Sites. The Environmental Protection Agency ("EPA") conducted a Remedial Investigation ("RI") and Feasibility Study ("FS") at the Site. The RI indicated the presence of various hazardous substances, including PCBs, trichloroethylene ("TCE"), and other VOCs. In a Record of Decision ("ROD") dated September 28, 1995, the EPA selected a remedy for the Site that included: (1) constructing four independent closure caps consistent with the requirements of New York State regulations at 6 N.Y.C.R.R. Part 360; (2) extracting contaminated groundwater from a certain bedrock acquifer, followed by air stripping or other appropriate treatment, and discharge to surface water (hot spot groundwater extraction); (3) restricting the installation and use of groundwater wells at the Site and the future use of the Site to protect the integrity of the caps; and (4) long-term monitoring of groundwater, surface water, and sediment. The ROD also contained a contingent remedy that included Site-wide extraction and treatment of groundwater if monitoring did not demonstrate that the groundwater quality in the bedrock aquifer would likely be restored within a reasonable time by natural attenuation. On July 5, 1996, the EPA determined that there was an actual or threatened release of hazardous substances at the Site that presented an imminent and substantial endangerment to the public health, welfare or the environment, and issued an Administrative Order directing Alliedsignal to perform the remedial design described in the ROD.

On March 28, 1997, the EPA commenced the instant litigation against defendants pursuant to 42 U.S.C. § 9607 seeking recovery of costs incurred in responding to the release or threatened release of hazardous substances at the SLF. On January 21, 1998, defendants filed a Third–Party Complaint against the municipal defendants asserting claims for contribution and indemnification, and seeking a declaratory judgment.

The EPA subsequently entered into administrative settlements with *de minimis* potentially responsible parties ("PRPs") (parties who are deemed to have contributed minimal amounts of hazardous substances or contributed hazardous substances the toxicity of which is minimal in comparison to other hazardous substances at the site, see 42 U.S.C. § 9622(g)).

The EPA also entered into a Consent Decree with the municipal defendants. Based upon information provided by Susan McIntyre ("McIntyre"), the Solid Waste Coordinator of the Delaware County Department of Public Works, each municipality was found to have deposited the following amounts of waste at the Site:

| Municipal Defendant | Tons of Waste Deposited |
| --- | --- |
| Town of Sidney | 2,040.00 |
| Village of Sidney | 8,792.00 |
| Town of Masonville | 697.50 |
| Town of Tompkins | 332.50 |

Relying on a policy statement issued by the EPA regarding settlements with municipalities, the EPA determined the per ton clean up cost to be $5.30. Thus, the Consent Decree called for the following payments, which are calculated by multiplying the tons of waste deposited by each municipality by $5.30:

| Town of Sidney: | $10,812.00 |
| --- | --- |
| Village of Sidney: | $46,597.60 |
| Town of Masonville: | $ 3,696.75 |
| Town of Tompkins: | $ 1,762.25 |

The total amount of payments attributable to the municipal defendants under the Consent Decree, $62,868.60, is but a fraction of the estimated $10,260,000 in cleanup costs at the Site. *See* United States Mem. of Law, at 8. With the exception of a reservation of rights by the United States, these payments would constitute the mu-

nicipalities' total liability to the United States for response costs incurred and to be incurred at or in connection with the Site. The Consent Decree also provides the municipalities with statutory protection from contribution claims or actions pursuant to 42 U.S.C. § 9613(f)(2) for all matters addressed by the Consent Decree. According to the terms of the Consent Decree, the municipalities would be immune for contribution claims for "all response actions taken or to be taken and all response costs incurred or to be incurred by the United States or any other person with respect to the site."

In accordance with statutory procedure, the EPA published the proposed Consent Decree in the Federal Register, allowing for public comment. Only Alliedsignal submitted comments regarding the Consent Decree.

Presently before the Court is the United States' motion for Court approval of the Consent Decree and the municipal defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56 seeking dismissal of the Third–Party Complaint in its entirety.

## II. DISCUSSION

### A. Approval of the Consent Decree

■■■ The Court will first evaluate the terms of the proposed Consent Decree between the United States and the municipal defendants.[5] In assessing a proposed consent decree, the Court must "satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve." *United States v. Cannons Eng'g*, 899 F.2d 79, 85 (1st Cir. 1990); *see also In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir.1992); *United States v. Akzo Coatings*, 949 F.2d 1409, 1423 (6th Cir.1991). Approval of a

proposed decree is committed to the discretion of the Court, giving due consideration to the policy favoring voluntary settlement. *See United States v. Hooker Chem. and Plastics Corp.*, 776 F.2d 410, 411 (2d Cir.1985). "While the ... [C]ourt should not mechanistically rubberstamp the agency's suggestions, neither should it approach the merits of the contemplated settlement de novo." *Cannons*, 899 F.2d at 84. Keeping in mind that the Court should "take a broad view of proposed settlements, leaving highly technical issues and relatively petty inequities to the discourse between parties"[,] ... [the Court] must "treat each case on its own merits, recognizing the wide range of potential problems and possible solutions." *Id.* at 85–86.

■■■ At issue here is whether the proposed Consent Decree is substantively fair. To be substantively fair, "a CERCLA settlement must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done." *Id.*, at 87. Because CERCLA may impose joint and several liability for response costs upon PRPs, another important consideration is the effect of the settlement on non-settlers. *See Akzo*, 949 F.2d at 1435.

Here, the proposed Consent Decree is based on McIntyre's estimates of the amount of waste deposited by each municipal defendant and the cleanup cost set forth in the EPA's Policy for Municipality and Municipal Solid Waste CERCLA Settlements at National Priorities List ("NPL") Co–Disposal Sites (the "Policy").[6] *See* 63 Fed.Reg. 8197 (1998). The Consent

---

5. For the purposes of evaluating the Consent Decree only, the Court assumes, as do the parties, that the municipal defendants may be held liable as arrangers for their residents' waste at the SLF. *See* discussion *infra* at II(B)(4).

6. A co-disposal site is defined as a "landfill ... that accepted both municipal sewage sludge and/or municipal solid waste and other wastes, such as industrial wastes, containing hazardous substances." 63 Fed.Reg. 8198 (1998).

Decree requires each municipal defendant to pay $5.30 in remedial costs for every ton of solid waste that it deposited at the SLF. *See supra* at 718. This $5.30 per ton cost represents the EPA's estimate of the cost per unit for remediation at a representative Resource Conservation and Recovery Act Subtitle D landfill.[7] *See* 42 U.S.C. § 6901, et seq. The United States contends that the municipalities should be responsible only for the costs associated with the remediation of a municipal solid waste ("MSW") landfill and not any remediation costs driven by the presence of industrial waste. In other words, the government insists that Alliedsignal alone should be responsible for any environmental damage caused by industrial hazardous waste deposited at the SLF.

Alliedsignal responds that the terms of the proposed Consent Decree are not fair because: (1) the $5.30 figure does not adequately represent the cost per ton of remediation at a typical New York MSW landfill; (2) it should not be held accountable for the majority of the cleanup costs because it did not dump any oil at the SLF; (3) the residents of the municipal defendants contributed 75% of the total waste at the Site; (4) the Town of Sidney disposed of hospital incinerator ash at the SLF that may contain hazardous substances; and (5) the United States entered into the Consent Decree with the municipal defendants as a matter of policy solely to afford them the statutory protection from contribution.

For the following reasons, the Court finds that the $5.30 figure is not fair or reasonable in light of the factual circumstances of this case and the known remediation costs of the Site. Specifically, the $5.30 figure does not fairly represent the response costs the municipal defendants could reasonably expect to pay for the closure of the SLF. Although the SLF may be classified as a co-disposal site, the Policy should not be followed blindly, par-

ticularly when doing so would lead to inequity. *See* 63 Fed.Reg. 8198; *see also, Chemical Mfrs. Ass'n v. E.P.A.*, 26 F.Supp.2d 180, 182 (D.D.C.1998).

The costs associated with closing a New York State MSW landfill likely are greater than the costs associated with closing a MSW landfill under federal regulations. Federal regulations provide minimum national criteria for closing MSW landfills. *See* 40 C.F.R. § 258.1; Subpart F. Pursuant to these regulations, an MSW landfill typically is closed with the placement of a "cap" over the waste. *See* 40 C.F.R. § 258.60. New York State Department of Environmental Conversation regulations, however, specify a heightened capping requirement for MSW facilities in New York State. *See* 6 N.Y.C.R.R. Part 360 ("Part 360"); Dec. 21, 1998 McIntyre Affidavit, at Ex. B., p. 7 ("New York State . . . adopted some of the strictest rules for capping and closing landfills in the nation."). Thus, the generalized model utilized in the Policy may not fairly represent the costs associated with closing an MSW landfill in New York State.

To support application of the $5.30 figure in this case, the government relies upon the affidavit of McIntyre. Although McIntyre recognized Part 360's heightened capping requirements, she nonetheless estimated the closure costs for "comparable" New York State landfills to range from $3.22 to $3.51 per ton of MSW. *See* McIntyre Aff., at Ex. B. According to the government, this demonstrates that the $5.30 figure is a conservative estimate. Alliedsignal challenges the McIntyre Affidavit, claiming that it excludes the operation and maintenance costs that comprise a significant portion of the response costs at the SLF and that it otherwise fails to take into account the actual circumstances at the SLF.

■ The Court agrees with Alliedsignal that the McIntyre affidavit does not sup-

---

7. Subtitle D governs the closure and post-closure requirements and corrective actions

for the remediation of hazardous waste at municipal solid waste landfills.

port application of the $5.30 figure to the SLF. First, McIntyre's figures are based upon first quarter 1991 costs without adjustment for inflation. Second, she provided no detailed explanation regarding how she derived these numbers or why. they are applicable to the SLF. Third, McIntyre excluded the costs of post-closure monitoring and maintenance, yet the Consent Decree covers *all* response costs, including those associated with operation and maintenance.

The Consent Decree settles with each municipal defendant "for its appropriate share of *response costs* incurred and to be incurred at or in connection with the Site." Consent Decree, at 5 (emphasis supplied). In its definition section, the phrase "remedial action" is defined to exclude operation and maintenance. The phrase "response costs," however, is defined to mean "all costs of 'response' as that term is defined by ... 42 U.S.C. § 9601(25)." The statute defines the term "response" to mean "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). The statute further defines " 'remedy' or 'remedial action' " to include "any monitoring reasonably required to assure that [the corrective actions taken] protect the public health and welfare and the environment." 42 U.S.C. § 9601(24). This necessarily includes costs associated with operating and maintaining the remedial action at the site. *See United States v. Hardage*, 750 F.Supp. 1460, 1519 (W.D.Okla.1990) ("[S]ite maintenance [is a] 'necessary cost[ ] of response ... consistent with the national contingency plan.' ") (quoting 42 U.S.C. § 9607(a)(4)(b)), *aff'd in part, rev'd in part on other grounds*, 982 F.2d 1436 (10th Cir.1992), *cert. denied*, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); *see also Freeport–McMoran Resource Partners Ltd. Partnership v. B–B Paint Corp.*, 56 F.Supp.2d 823, 841 (E.D.Mich.1999) (necessary costs of response include operation and maintenance of cap system); *Montana Rfg. Co. v. National Union Fire Ins. Co. of Pittsburgh*, 918 F.Supp. 1395, 1397 (D.Nev. 1996) (operation and maintenance consti-

tute response activities); 6 N.Y.C.R.R. 360–2.7(c); 360–2.15(k).

This conclusion is further supported by the language in 42 U.S.C. § 9613(g). Section 9613(g) establishes a three year statute of limitations for civil proceedings arising out of CERCLA. That section specifically provides that "an action for damages under this chapter must be commenced within 3 years after the completion of the remedial action (excluding operation and maintenance activities).…" *Id.* By specifically excluding operation and maintenance activities from the definition of "remedial action" in § 9613(g), such activities necessarily must have been included in the broader statutory definition of remedial action contained in 42 U.S.C. § 9601(24). *See Russo v. Trifari, Krussman & Fishel, Inc.*, 837 F.2d 40, 45 (2d Cir.1988) ("Construing identical language in a single statute in *pari materia* is both traditional and logical."). Thus, the statutory definition of "response" includes operation and maintenance.

In discussing the appropriate share of costs to be borne by the municipal defendants and their immunity from contribution, the Consent Decree uses the term "response costs," rather than costs of "remedial action." This suggests that the Consent Decree intended to include operation and maintenance costs. If the Consent Decree was to exclude operation and maintenance costs, then it should have stated so either explicitly or by using the phrase "remedial action costs."

Further, the Consent Decree purports to settle with each municipal defendant "for its appropriate share of response costs incurred *and to be incurred* at or in connection with the Site." Consent Decree, at 5 (emphasis supplied). The Consent Decree also intends to absolve the municipal defendants from "any potential civil liability it may have under ... CERCLA ... for response costs incurred *and to be incurred* at or in connection with the Site." *Id.* (emphasis supplied). The broad lan-

guage covering all past and future response costs indicates that the Consent Decree was intended to include operation and maintenance costs. *See e.g. United States v. Alcan Aluminum, Inc.,* 25 F.3d 1174, 1186 (3d Cir.1994). Finally, if the Consent Decree did, in fact, exclude operation and maintenance costs, then the municipal defendants would remain liable for a contribution claim by Alliedsignal for such costs, a result which the United States and the municipal defendants apparently did not intend. *See* 42 U.S.C. § 9613(f)(2) (settling party is not liable for claims for contribution "regarding matters addressed in the settlement."); *see e.g., Alcan,* 25 F.3d 1174, 1186; Government's Mem. of Law, at 10 ("The intent of th[e] [consent decree's protection from contribution claims] is to fully protect the towns from any and all claims the corporations have made and may make against them with respect to response actions or costs concerning the site."). Because the Consent Decree includes operation and maintenance costs, but the figures calculated by McIntyre exclude such costs, her figures do not provide an accurate basis for comparison and do not support the use of the $5.30 amount.

■ Significantly, a Consent Decree imposing liability based on allegedly representative models may be capricious when the actual conditions of the Site and estimated remediation costs are known. *See generally, United States v. Montrose Chem. Corp. of California,* 50 F.3d 741, 746–47 (9th Cir.1995) (vacating district court's approval of consent decree because propriety of decree could not be properly determined without use of the actual total projected costs at the site). The government states that it did not use the estimated cleanup costs for the Site because it determined "that industrial waste and not MSW is driving the Site remedy and that, *but for* ... [Alliedsignal's] disposal of industrial waste at the Site, there would be no CERCLA cleanup. Put differently, *but*

*for* ... [Alliedsignal's] disposal of industrial waste at the Site, there would be no remediation-based claims against the [municipal defendants]." Municipal Defendants' Mem. of Law in Support of Entry of Consent Decree, at 4 (emphasis in original). In support of this proposition, the Government submits the affidavit of Young Chang ("Chang"), Remedial Project Manager for the EPA at the SLF and RHLF, who states that "but for the presence and concentration of these hazardous substances [PCBs and VOCs], [the SLF] would not be an NPL site." Chang Aff., ¶ 6. Chang further states that the portion of the remedial action calling for hot spot groundwater treatment "is clearly not related to the disposal of MSW, but rather to the disposal of industrial hazardous waste." *Id.,* at ¶ 7.

■ It must be remembered, however, that the Consent Decree is based on the premise that the municipal defendants are liable for having arranged for the disposal of waste by its residents at the SLF. Bendix was a resident of the Town of Sidney. The 1964 contract entered into between the Town of Sidney and Devere (that was for use of the RHRL) specifically included "residue oil as disposed of by ... Bendix." During the term of that contract, the RHRL was closed and Devere began using the SLF. Thus, the Town of Sidney arguably is liable for having arranged for the disposal of Bendix's hazardous waste oils at the SLF. *See* discussion *infra* at II(B)(4). It, therefore, is irrelevant whether the SLF would be on the NPL absent the waste oils because the Town may be partially responsible for the disposal of such waste at the Site. Accordingly, upon reviewing the proposed Consent Decree, the Court will not ignore the realities of the conditions of the Site. Hence, any potential consent decree must take into consideration the actual conditions of the Site and must attempt to reasonably apportion liability according to the parties'

relative fault.[8]

■ Finally, even a cursory review of the cleanup costs at the Site reveals that the Consent Decree does not approximate the municipal defendants' proportionate share of liability. It appears that the majority of waste at the Site came from the municipal defendants' residents. Bendix's proportion was small compared to the total contributions of all other residents. The average cost of capping a landfill under 6 N.Y.C.R.R. Part 360 ranges between $130,000 to $150,000 per acre, plus up to $250,000 in engineering costs. *See* McIntyre Aff., at Ex. A, Sub Ex. B, p. 7. The SLF is approximately 74 acres. *See* Consent Decree, at 7. Multiplying $130,000 * 74 acres + $250,000 yields a total cleanup cost of $9,870,000, which is close to the actual estimated cleanup costs at the SLF. As noted, the municipal defendants deposited the majority of waste at the Site. It, therefore, is reasonable to assume that they contributed at least one acre's worth of waste to the Site; yet, the cleanup costs attributed to them in the Consent Decree are insufficient to cap even one acre at the Site. Accordingly, the Consent Decree is not substantively fair.

The Court need not engage in detailed review of the Consent Decree and calculate actual proportions of fault, ascertain relative levels of toxicity, or determine cleanup costs with mathematical certainty. That is not the Court's function. Instead, the Court must ensure that any proposed Consent Decree is substantively fair. Because there is ample evidence suggesting that the municipal defendants contributed the majority of waste to the SLF; the volume and shallow depth of the waste is driving the need for four separate caps at the Site, rather than one; the Town of Sidney may be held liable for having arranged for the disposal of waste oil at the SLF; closure costs under New York State regulations may be more expensive than such costs under federal regulations; and because municipal waste can contain hazardous waste that, due to its greater volume and reduced toxicity, may cost more to clean than an industrial or commercial toxic waste site, see *B.F. Goodrich v. Murtha*, 958 F.2d 1192, 1197 (2d Cir.1992) ("Murtha"), the Court finds that the proposed Consent Decree does not apportion liability according to rational estimates of how much harm each PRP has done.

The projected cleanup costs for the SLF were known at the time the parties negotiated the Consent Decree and, thus, there is no need to utilize a model to set the per unit cost of cleanup. If the municipal defendants (or some of them) are not liable for the industrial waste, then the costs associated with the hot spot groundwater treatment that apparently was necessitated by the presence of industrial waste could be deducted from the total projected estimated cleanup costs.

The Court recognizes that CERCLA consent decrees often are necessarily imprecise and, because of CERCLA's goals of encouraging early settlement and reducing litigation costs associated with site cleanup, frequently result in disproportionate liability. These policy considerations notwithstanding, a substantively unfair consent decree must be rejected. *See Cuyahoga*, 980 F.2d at 119. The parties have not satisfied their burden of supporting the basis for the Consent Decree to the Court's satisfaction. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 464 (2d Cir. 1974). For the foregoing reasons, the Court finds the $5.30 per unit cost of cleanup utilized by the government in the proposed Consent Decree to be unfair and unreasonable under the circumstances of this case and the Consent Decree is, there-

8. The Court further notes that the Policy was not intended to apply to municipalities who arranged for the disposal of non-MSW containing a hazardous substance. *See* Peirce Decl., at Ex. 12, p. 8. Thus, to the extent the municipalities may be responsible for arranging for the disposal of Bendix's industrial waste, the Policy is inapplicable.

fore, disapproved.[9]

## B. Municipal Defendants' Motion for Summary Judgment

### 1. Summary Judgment Standard

The standard for summary judgment is well-settled. Under FED. R. CIV. P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to a judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see also Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir.1996). The moving party bears the initial burden of "informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c)). The initial burden is to demonstrate "that there is an absence of evidence to support the nonmoving party's case." Id. at 2554, 106 S.Ct. 2548.

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Celotex Corp.*, 106 S.Ct. at 2548. A dispute regarding a material fact is genuine if a reasonable jury could return a verdict for the non-moving party; that is, whether the non-movant's case, if proved at trial, would be sufficient to survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When reasonable minds, however, could not differ as to the import of the evidence, then summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), the motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & H.R. Co. v. Consolidated Rail*, 902 F.2d 174, 178 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) (quoting *Matsushita*, 106 S.Ct. at 1356); *see also Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990). Indeed, the non-moving party's opposition may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

With this standard in mind, the Court will now address the municipal defendants' motion for summary judgment.

### 2. Alliedsignal's Section 107 Claim

■ The municipal defendants first seek dismissal of Alliedsignal's claim pursuant to CERCLA § 107, 42 U.S.C. § 9607, on the ground that a PRP cannot bring a cost recovery action against another PRP under section 107, but is limited to asserting a contribution action under section 113, 42 U.S.C. § 9613. The municipal defendants are correct on this point and,

---

9. As noted, there is also much disagreement and uncertainty over the amount of waste deposited by the municipal defendants. Insufficient facts have been presented to enable the Court to intelligently review the amounts of waste attributed to the municipal defendants in the Consent Decree. *See Grinnell Corp.*, 495 F.2d at 463. Because the Court has found the $5.30 figure to be unreasonable, it need not address the amounts of waste attributed to each municipal defendant in the Consent Decree.

thus, Alliedsignal's first cause of action is dismissed. *See Prisco v. A & D Carting Corp.,* 168 F.3d 593, 603 (2d Cir.1999); *Bedford Affiliates v. Sills,* 156 F.3d 416, 424 (2d Cir.1998).

### 3. Immunity from Contribution Under Section 113(f)(2).

The municipal defendants next move to dismiss the Third–Party Complaint on the ground that section 113(f)(2), 42 U.S.C. § 9613(f)(2), immunizes them from liability for claims for contribution regarding matters addressed in the settlement. While section 113(f)(2) grants settling parties protection from contribution claims, see *Bedford Affiliates,* 156 F.3d at 427, such protection is available only when the parties' liability to the United States has been resolved "in an administrative or judicially approved settlement." 42 U.S.C. § 9613(f)(2). The present matter does not involve an administrative settlement, but one presented to this Court for approval. Because the Court has rejected the proposed Consent Decree, the municipal defendants are not entitled to the statutory protection of section 113(f)(2). *See* 42 U.S.C. § 9613(f)(2).

### 4. Whether Municipal Defendants are "Arrangers" Under CERCLA

Finally, the municipal defendants move to dismiss the Third–Party Complaint on the ground that they are not "arrangers" who may be held liable under CERCLA. Specifically, the municipal defendants argue that they merely contracted with Rosa, Devere, and/or Bartlett to make disposal areas available for their residents by subsidizing the costs of dumping at the Site, but that they never collected refuse or required their residents to dispose of refuse at the SLF. Alliedsignal responds that the municipalities disposed of their own waste at the SLF and that the their contracts with Rosa and/or Bartlett are sufficient to establish arranger liability with respect to their residents' waste.

To establish a *prima facie* case under section 113, Alliedsignal must establish that: (1) the municipal defendants fit into one of the four classes of responsible parties outlined in § 9607(a); (2) the Site is a facility; (3) there is a release or threatened release of hazardous substances at the facility as defined in § 9601(9); (4) it incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan set up under the Act and administered by the EPA in order to prioritize hazardous substance release sites throughout the nation. *See Prisco,* 168 F.3d at 601; *B.F. Goodrich, Co. v. Betkoski,* 99 F.3d 505, 514 (2d Cir.1996), *cert. denied sub nom. Zollo Drum Co., Inc. v. B.F. Goodrich, Co.,* — U.S. —, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998); *Murtha,* 958 F.2d at 1198. The only element at issue here is the first— whether the municipal defendants fall within one of the four classes of responsible parties set forth in section 9607(a). There being no genuine issue of fact that the municipal defendants did not own or operate a facility, see 42 U.S.C. §§ 9706(a)(1),(2), or accept hazardous substances for transport to disposal or treatment facilities, see 42 U.S.C. § 9706(a)(4), this issue can be further refined to whether the municipal defendants are subject to "arranger liability" under section 9607(a)(3).

Section 9607(a)(3) provides that:

any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ... shall be liable for (A) all costs of removal or remedial action incurred by the United State Government ....; (B) any other necessary costs or response incurred by

any other person ....; (C) damages for injury to, destruction of, or loss of natural resources ....; and (D) the costs of any health assessment or health effects study.

By the plain terms of the statute, the municipal defendants may be liable under section 9607(a)(3) if they: (1) arranged for the disposal of, (2) hazardous substances, (3) owned or possessed by them. *See* 42 U.S.C. § 9607(a)(3). The Court will address each of these elements in turn.

### a. Whether the Municipal Defendants Arranged for the Disposal of Waste at the SLF

 The first question is whether the municipal defendants arranged for the disposal of waste at the SLF. The word "arrange" is defined as "to plan or prepare for" or "to agree about." Webster's II New Riverside Univ. Dictionary, at 126. Using this understanding of the word "arrange," together with the broad remedial purpose of CERCLA, see *Prisco,* 168 F.3d at 602; *Betkoski,* 99 F.3d at 514 ("CERCLA is a broad remedial statute.... [and] should be construed liberally to give effect to its purposes."); *United States v. New Castle County,* 727 F.Supp. 854, 871 (D.Del.1989) (citing *United States v. Aceto Agr. Chems. Corp.,* 872 F.2d 1373, 1380 (8th Cir.1989)), a rational finder of fact could reasonably conclude that the municipal defendants arranged or planned for the disposal of refuse at the SLF. This is because there is evidence from which a trier of fact could conclude that the municipal defendants intentionally entered into agreements with Rosa, Devere, and/or Bartlett, the purpose of which was to secure a location at which the municipalities or their residents could dispose of waste. *See Transportation Leasing Co. v. State of California,* 861 F.Supp. 931, 942 (C.D.Cal. 1993) ("It is well settled that one who contracts for disposal has 'arranged' for disposal.").

With respect to the Sidney Defendants, there is evidence that these municipalities contracted with Rosa "for disposal at such landfill operation area of all garbage and refuse from the Town and Village of Sidney" in exchange for a fee.[10] Despite the fact that it may have been up to individual residents to decide whether they wanted to use the SLF and that the individual residents had to hire a hauler to transport their refuse to the landfill, a trier of fact could conclude that the Sidney Defendants nonetheless made arrangements with Devere for the disposal of waste at the SLF.

There also exists evidence suggesting that the Sidney defendants disposed of their own waste at the SLF. For example, the Town of Sidney operated a hospital which admittedly disposed of incinerator ash at the SLF. The Village of Sidney apparently entered into an agreement with Bartlett in October 1971 for the collection and disposal of refuse from waste bins located on Main Street in the Village of Sidney.

Unlike the Sidney Defendants, the Towns of Masonville and Tompkins did not enter into written agreements with Rosa, Devere, or Bartlett. The Town of Masonville submitted an affidavit from its former supervisor for the years 1956 to 1975, Henry Eckhardt, who states that the Town of Masonville never owned or operated the Site, it never transported hazardous waste or substances to the Site, it never had municipal waste collection or disposal, and it never arranged with the operator of the Site to provide town residents with access to that landfill. Alliedsignal, however, submitted Bartlett's certified response to the EPA and his affidavit wherein he states that shortly after his purchase of the SLF, he "entered into an agreement with the Town of Masonville, under which all waste generated by its residents was accepted for disposal." Also submitted for review were the minutes of the Masonville Town Board reflecting that Bartlett re-

---

**10.** As previously noted, the parties dispute whether the Sidney Defendants contracted for

the disposal of waste at the SLF. *See supra* at n. 4.

ceived monthly payments for waste disposal. Thus, there is a genuine issue of fact whether the Town of Masonville arranged for the disposal of waste at the SLF.

The Town of Tomkins submitted the affidavit of its former Town Supervisor for the years 1958 to 1993, Perry Shelton ("Shelton"), who stated that the Town of Tompkins never owned or operated the Site, it never had municipal waste collection or disposal, there was never any formal agreement between Rosa and the town, and that the town "dug one or more pits or trenches at the Site and may have covered trenches on one or more occasions . . . in exchange for Mr. Rosa . . . granting Town residents the privilege of disposing of their household trash and garbage at the Site if they so chose." Alliedsignal, however, argues that the town's digging of pits with its bulldozer in exchange for permission for town residents to use the landfill constitutes an arrangement for the disposal of waste at the SLF. In support, Alliedsignal points to a letter from Shelton to the EPA wherein he acknowledges that:

> for some short period of time Mr. Rosa allowed one or more haulers to take household garbage and trash to the [SLF]. Also individual residents . . . were allowed to take household garbage and trash to the [SLF] during this period of time. . . . No formal agreement or contract was ever made by the Town of Tompkins with Mr. Rosa allowing the disposal of garbage at this landfill, only a verbal agreement existed.

Alliedsignal also points to Bartlett's certified response to the EPA wherein he states that he purchased the SLF from Rosa, hauled waste to the SLF, and "continued to operate under agreement with . . . [the] Town of Tompkins." This evidence similarly raises a triable issue of fact regarding whether the Town of Tompkins arranged for the disposal of waste at the SLF.

Looking at the evidence in the light most favorable to the non-movants, a rational trier of fact could conclude that the municipal defendants planned or arranged for the disposal of waste at the SLF.

### b. Whether the Waste is Hazardous

Of course, it is not enough that the municipal defendants arranged for the disposal of waste at the SLF. To be liable under CERCLA, the municipal defendants must have "arranged for disposal . . . *of hazardous substances.*" 42 U.S.C. § 9607(a)(3) (emphasis supplied). CERCLA "is not so far-reaching that anyone who has ever [arranged for the disposal of] waste material to a site becomes a potentially responsible party within the meaning of [§ 107(a)(3) ] even if the material was wholly innocuous with no hazardous substance in it. . . . To impose liability on a defendant, a CERCLA plaintiff must . . . show that the material contained a hazardous substance." *Prisco,* 168 F.3d at 605. Thus, the Court must now address whether a rational trier of fact could find that the municipal defendants arranged for the disposal of hazardous waste at the SLF.

The municipal defendants do not argue that the waste sent to the SLF was not hazardous. Alliedsignal, on the other hand, submitted the affidavit of its expert, Robert Harris, who opined that "[a]n evaluation of environmental (i.e., ground water, surface water, sediment and leachate) data collected from the SLF . . . and presented in the Remedial Investigation Report . . . indicates that the environmental impacts associated with this Site appear to be consistent with municipal solid waste (MSW) disposal." Harris referred to several studies that have found "ample evidence that the municipal waste landfill leachates contain toxic chemicals in sufficient concentrations to be potentially as harmful as leachate from industrial waste landfills." Harris thus stated that "it is reasonable to conclude that landfilling of municipal waste could result in environmental impacts similar in many ways to those measured at the SLF." Based upon this evidence, a rational trier of fact could conclude that the hazardous waste at the

Site was from waste disposed of by the municipal defendants. Indeed, such a conclusion is supported by the case law. *See Murtha*, 958 F.2d at 1197.

### c. Whether the Municipal Defendants Owned or Possessed the Hazardous Wastes Deposited at the SLF.

■ Finally, Alliedsignal must demonstrate that the municipal defendants disposed of hazardous waste "owned or possessed by [them]." 42 U.S.C. § 9607(a)(3); *see also State of New York v. City of Johnstown*, 701 F.Supp. 33, 36 (N.D.N.Y. 1988). To satisfy this prong, Alliedsignal must demonstrate "a sufficient nexus ... between the [potentially responsible party] and the hazardous substances." *Murtha*, 958 F.2d at 1199; *City of Johnstown*, 701 F.Supp. at 36 ("there has to be some nexus between the allegedly responsible party and the owner of the hazardous substances."). As long as some nexus can be shown, it is irrelevant whether the municipalities "did not have active involvement regarding the timing, manner, or location of disposal." *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir.1992) (quoting *CPC Int'l, Inc. v. Aerojet–General Corp.*, 759 F.Supp. 1269, 1279 (W.D.Mich.1991)). In the context of municipalities, the Second Circuit has found the necessary nexus wanting "where the governmental unit is responsible only for promulgating disposal regulations or for permitting disposal facilities ... [but present where the municipality] manag[es] the disposal activities." *Murtha*, 958 F.2d at 1199. Further, whether there is a sufficient nexus is not dependent upon the quantity or concentration of the hazardous substances, see *Prisco*, 168 F.3d at 602, but rather upon a showing that the municipal defendants somehow owned or possessed, either actually or constructively, hazardous substances. *See City of Johnstown*, 701 F.Supp. at 36; *Transportation Leasing*, 861 F.Supp. at 936.

As discussed, a trier of fact could reasonably conclude that the Sidney Defendants deposited their own waste at the SLF. To the extent that any of the municipal defendants deposited their own hazardous waste at the SLF, this element is readily satisfied. *See Transportation Leasing Co.*, 861 F.Supp. at 949; *United States v. A & F Materials Co., Inc.*, 582 F.Supp. 842, 845 (S.D.Ill.1984). The more difficult question is whether the municipal defendants may be held accountable for the waste generated by their residents and disposed of at the SLF.

While the municipal defendants did not exercise control over individual residents' disposal of waste, did not collect residents' waste, and did not require residents to use the SLF, a trier of fact could conclude that the municipal defendants contracted with Rosa, Devere, and/or Bartlett to ensure that a landfill was available for their residents' use. Such action by the municipal defendants is certainly more hands-on than the mere promulgation of disposal regulations or permission of disposal facilities, which the Second Circuit has stated is insufficient to satisfy the requisite nexus. *See Murtha*, 958 F.2d at 1199. On the other hand, the municipal defendants' actions are seemingly less than that of the active management of disposal activities that would unquestionably establish a sufficient nexus. *See id.* Thus, the Court finds itself in the badlands of judicial uncertainty.

The municipal defendants argue that "as a matter of national policy, the scope of 'arranger' liability should not be irrationally broadened to encompass government activities aimed at subsidizing ... solid waste management activity." Municipal Defendants' Mem. of Law, at 15. The municipal defendants further contend that arranger liability was intended to be imposed upon those activities aimed at reaping the financial awards of a commercial transaction, while their own activity was that of preserving and protecting the public health and environment. While the

Court recognizes that one of CERCLA's goals is to impose liability on responsible parties, rather than force taxpayers to shoulder the burden of clean-up costs, "a narrow interpretation of CERCLA that exempts municipalities arranging for the disposal of municipal solid waste from liability increases the probability that clean-up costs will never be recovered, and will be paid instead from the Superfund funded in part by the taxpayers at large." *Murtha*, 958 F.2d at 1204. Further, "[a]lthough municipalities do not benefit in a proprietary sense from arranging for the disposal of municipal solid waste, their taxpayers do obtain a benefit—given the necessity of disposal of such waste." *Id.* Thus, these arguments raised by the municipal defendants are without merit.

The municipal defendants also cite to *New York v. City of Johnstown*, 701 F.Supp. 33 (N.D.N.Y.1988), *U.S. v. New Castle County*, 727 F.Supp. 854 (D.Del. 1989), and *Hassayampa Steering Comm. v. State of Arizona*, 768 F.Supp. 697 (D.Ariz.1991), in support of their argument that they did not own or possess hazardous substances. These cases, however, are readily distinguishable because the extent of the municipalities' involvement in those cases was in regulating waste disposal and undertaking remedial action, not in contracting with private individuals to ensure the availability of a landfill site for waste disposal.

For example, in *City of Johnstown*, the defendant in a CERCLA action commenced by the State of New York counterclaimed against the State seeking contribution. The extent of the State's involvement, however, was in directing depositors to dispose of their wastes at one of two sites. In particular, because the Johnstown site no longer accepted hazardous substances, the State directed the defendant to dispose of its hazardous waste at the Gloversville site. The defendants argued that the State "either permitted or directed waste to be placed in the facilities." The court concluded

that there was no nexus between the State of New York and the owner of the hazardous substances because the State was merely acting to "remediate the hazardous waste problems at both sites and cannot be considered in the class of liable parties." *City of Johnstown*, 701 F.Supp. at 36.

Similarly, in *New Castle County*, the defendants attempted to implead the State of Delaware because of its active role in regulating the subject site. The court found, however, that the State of Delaware's actions "taken pursuant to its regulatory and statutory mandate," [do] not amount to sufficient activity to "give rise to ... arranger status under CERCLA." *New Castle County*, 727 F.Supp. at 875. Rather, "[t]he State of Delaware was attempting to solve the problem of the safe disposal of wastes—some of which may be determined to be hazardous—a situation that is analogous to the State of New York in its attempt to remediate the hazardous waste problems at the sites in *Johnstown*." *Id.* at 874.

Unlike *City of Johnstown* and *New Castle County*, here there is a greater "nexus between the allegedly responsible person and the owner of the hazardous substance." *Id.*, at 36. The municipal defendants were not undertaking remedial action, but contracted to ensure their residents would have a place to dispose of their waste. While the contracts between the Sidney Defendants required Rosa and Devere to ensure that the SLF was operated in a safe manner consistent with applicable laws and regulations, that condition was ancillary to the contract's main purpose—to ensure a location for their residents to dispose waste if they so chose. The municipal defendants were not acting in their regulatory capacities overseeing and remediating hazardous waste sites, but in a commercial capacity seeking to secure a landfill to benefit their residents.

The situation posed in *Hassayampa* is more akin to the present situation. The

Hassayampa landfill was owned and operated by Maricopa County. At the request of the State of Arizona, the landfill was made available for the deposit of hazardous waste. The State notified transporters that the landfill was available and established a system to screen and track deposits, although depositors were not required to use the landfill. The State also assisted the county in designing the pits into which various types of waste would be directed. The court found there to be an insufficient nexus with the owners of the hazardous substances to hold the State liable under CERCLA. The court believed the State of Arizona's actions to be similar to that of the State of Delaware in *New Castle County,* and concluded that "the State here was simply 'attempting to solve the problem of the safe disposal of wastes.'" *Hassayampa,* 768 F.Supp. at 702 (quoting *New Castle County,* 727 F.Supp. at 874). One of the reasons the court did not find the requisite nexus is because the State of Arizona did not have "authority to decide on behalf of the owner where the waste would be deposited." *Id.*

Here, however, there is evidence suggesting that the municipalities were more interested in finding a location for the disposal of wastes rather than ensuring the safe disposal of wastes. Further, the trier of fact could find that the municipal defendants did not merely allow persons to deposit hazardous wastes at the SLF, but that they affirmatively undertook to ensure that the SLF was available for their residents to deposit waste by contracting with Devere and/or Bartlett. While the municipal defendants did not have authority to decide on behalf of their residents where the waste would be deposited, that inquiry is not determinative. A rational finder of fact could conclude that the municipal defendants effectively dictated where their residents' waste would be deposited by providing them with a subsidized option at the SLF.

The present matter is more analogous to *Murtha,* where both the district court and

the Second Circuit found the municipalities to fit into one of the four classes of responsible parties under § 9607(a)(3). *See B.F. Goodrich Co. v. Murtha,* 754 F.Supp. 960, 974 (D.Conn.1991) ("*Murtha I*"), *aff'd,* 958 F.2d 1192 (2d Cir.1992). For example, in *Murtha,* the Town of Bethany arranged for its residents to dispose of their household waste at the subject landfill every Saturday. *See Murtha I,* 754 F.Supp. at 969. Similarly, there was evidence that over a two week period, waste from the City of Stamford was taken to the subject landfill. *Id.* at 970. The district court held that this evidence created a triable issue of fact whether the municipalities could be held liable as arrangers under § 9607(a)(3). The district court specifically noted that the "argument that the waste was generated by residents, not the municipalities themselves, is unavailing. A person need not have generated the hazardous substance to incur liability under Section 107(a)(3)." *Id.,* at 974. On appeal, the Second Circuit affirmed finding a sufficient nexus between the municipalities at issue and the hazardous waste. *See Murtha,* 958 F.2d at 1199.

Here, a rational finder of fact could find that the municipal defendants had sufficient control over the waste; that, although they were not obligated to exercise control over hazardous waste disposal, they affirmatively undertook active involvement in seeking and securing a location for the disposal of such waste, *see General Electric,* 962 F.2d at 286; that by subsidizing the costs of disposal at the SLF, they effectively dictated where municipal waste would be disposed; that they had actual involvement in the decision to dispose of waste; or that there was otherwise a sufficient nexus with their residents to impose liability under § 9607(a)(3). *See Cadillac Fairview/California, Inc. v. United States,* 41 F.3d 562, 565 (9th Cir.1994) ("On a motion for summary judgment, the question is whether the fact-finder could infer from all the circumstances that a transaction in fact involves an arrange-

ment for the disposal or treatment of a hazardous substance.") (internal citations and quotations omitted).

## III. CONCLUSION

For the foregoing reasons, the United States' motion for entry of the Consent Decree and the municipal defendants' motion for summary judgment are DENIED.

**IT IS SO ORDERED.**